UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEREK WOOLLAM, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Civil No. 19-10655-LTS |
| | ) |
| BRAD COWEN, | ) |
| | ) |
| Respondent. | ) |

MEMORANDUM AND ORDER ON PETITION FOR HABEAS CORPUS (DOC. NO. 1)

May 22, 2020

SOROKIN, J.

Derek Woollam, a prisoner at the Massachusetts Correctional Institution in Norfolk,

Massachusetts, has filed a counseled petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  He raises a single constitutional challenge to his conviction and sentence, arguing that

statements he made to law enforcement officers were admitted at his trial in violation of his Fifth

and Fourteenth Amendment rights.  The respondent has opposed the petition.  Because his claim

is meritless, Woollam's petition is DENIED.

I.       BACKGROUND

On February 2, 2009, following a jury trial in Bristol County Superior Court, Woollam

was convicted of first-degree murder and marijuana trafficking in violation of Massachusetts

law.  Commonwealth v. Woollam, 87 N.E.3d 64, 67 (Mass. 2017); Doc. No. 1 at 2-3;[1] S.A. at 2,

---

[1] Citations to items on the Court's electronic docket reference the assigned document number and
the page number from the ECF header at the top of each page.

12-13.[2]  He received a mandatory sentence of life imprisonment without the possibility of parole

for murder and a concurrent term of years for the drug charge.  Doc. No. 1 at 1; S.A. at 6, 15.

The charges against Woollam arose from a July 2006 shooting.  The Supreme Judicial

Court ("SJC") summarized the evidence as follows:

> In 2006, John Oliveira ran a large-scale drug operation out of a studio apartment in
> a duplex in Swansea.  At the time of his death, he had two "employees": [Woollam],
> who delivered marijuana to customers and collected the money; and Dylan
> Hodgate, who broke down the larger quantities of marijuana and repackaged them
> into smaller bags.  Oliveira's girl friend lived in the other apartment in the duplex.
>
> Oliveira had several rules in connection with his drug business . . . .  For instance,
> the exterior doors were always to be kept locked . . . and one of the four of them
> was always to be present at the house.  Further, [Woollam], the girl friend, and
> Hodgate were prohibited from being under the influence of drugs.
>
> In January or February of 2006, Oliveira's girl friend discovered that [Woollam]
> was using drugs, and began procuring pills from him.  [Woollam] and Oliveira's
> girl friend agreed not to tell Oliveira about their use of pills.  Over the course of
> several months, the relationship between Oliveira and [Woollam] deteriorated. . . .
>
> On July 4, 2006, Oliveira discovered a text message from his girl friend . . . asking
> [Woollam] for pills.  Oliveira was very upset and told [Woollam], "You broke the
> rules."  When [Woollam] lied and said that the pills were likely for the girl friend's
> cousin, Oliveira said that he would speak to the girl friend that night and would "let
> [Woollam] know" after that.  Oliveira sent a text message to his girl friend that
> night to let her know that he was "pissed," and that he would be coming by the
> apartment to discuss the matter, warning her "not [to] lie."
>
> Later that night, although Oliveira and his girl friend had seemingly resolved the
> matter, he was still angry with [Woollam].  At approximately 12:15 A.M., Oliveira
> received a telephone call and told his girl friend that he was going to pick up
> Hodgate and would be right back.  He never returned.
>
> The last call made from Oliveira's cellphone was to Hodgate's cellphone at 1:28
> A.M.  At approximately 1:43 A.M., a Swansea police officer on routine patrol saw

---

[2] The respondent has filed a Supplemental Answer, attaching the state-court record in four bound
volumes, two of which were filed under seal.  Doc. Nos. 15, 18.  Thereafter, the respondent
submitted an amended version of all volumes, then a corrected version of the fourth volume.
Doc. Nos. 26, 27.  Citations herein to "S.A." are to the most recent version of each bound
volume.  None of the cited portions are within the sealed materials.

a black Mercury Sable (the make, model, and color of [Woollam]'s automobile) pull out of the driveway of the house with two people inside.

The next morning, Oliveira's girl friend saw Oliveira's automobile in the driveway. The interior door to the studio apartment was locked, and there was no answer when she knocked.  This was unusual . . . . She was unable to reach Oliveira, [Woollam], or Hodgate by telephone . . . .  When she returned later that afternoon, Oliveira's automobile was in the same spot.  When she knocked on the studio apartment door, there was still no answer . . . . Eventually, she discovered that the exterior back door to the studio apartment was unlocked.  When she entered, she found Oliveira's body lying in a pool of blood.  He had been shot several times and was cold to the touch.

An autopsy revealed that Oliveira had been shot four times. . . .

Soon after Oliveira's girl friend discovered the body, [Woollam] arrived.  Before the police were called, [Woollam] removed marijuana in large duffel bags from the studio apartment and left with them in his black four-door automobile.

Over the next few days, [Woollam] enlisted help from others to distribute the marijuana that came from the studio apartment, and to clear out a storage locker in his name containing guns and ammunition.  He also removed the batteries and subscriber identity module (SIM) cards from his cellphones to avoid being tracked. He admitted to one of the people who assisted him . . . that he killed the victim because he believed that the victim was going to kill him after learning about the pills, and that Oliveira suspected that [Woollam] was having an affair with Oliveira's girl friend.  One to two weeks later, [Woollam] . . . burn[ed] a bag containing the sneakers and clothes from the night of the shooting.

Woollam, 87 N.E.3d at 67-68.

At trial, the prosecutor offered into evidence certain statements Woollam made to police during an interview on July 6, 2020—statements which had been the subject of an unsuccessful pretrial suppression motion.  Id. at 75; S.A. at 2312-23.  The interview and the relevant statement will be described in more detail in the discussion section below.  Woollam testified as the only defense witness at trial and denied killing Oliveira.  Id.  The jury was not persuaded, returning a verdict of guilty the same day it began deliberating.  S.A. at 6, 1897, 2025-28.

Woollam filed a timely direct appeal.  S.A. at 6-7; Doc. No. 1 at 3.  The SJC stayed its consideration of the appeal to permit Woollam's counsel time to prepare and litigate a motion for a new trial before the Superior Court.  S.A. at 19-21.  The motion was denied, S.A. at 10, and the

SJC consolidated Woollam's appeal of that decision with his direct appeal, S.A. at 21.  On

December 13, 2017, the SJC affirmed Woollam's convictions and the denial of his motion for a

new trial.  Woollam, 87 N.E.3d at 67.  The Supreme Court denied Woollam's petition for

certiorari on April 16, 2018.  S.A. at 22.

In his timely federal habeas petition, Woollam advances only one of the several

challenges considered and rejected by the SJC:  that his federal constitutional rights were

violated by the trial court's admission of inculpatory statements he made to police on July 6,

2006.  Doc. No. 1 at 8; see Woollam, 87 N.E.3d at 75-76.  Woollam's petition is fully briefed

and ripe for resolution.

II.   LEGAL STANDARD

State court decisions merit substantial deference.  Federal district courts may not grant a

writ of habeas corpus unless they find that the state court's adjudication of the petitioner's claims

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States[,] or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  As the Supreme

Court repeatedly has emphasized, these standards are "difficult to meet," with the petitioner

carrying a heavy burden of proof.  Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen

v. Pinholster, 563 U.S. 170, 181 (2011); see Burt v. Titlow, 571 U.S. 12, 19-20 (2013)

(emphasizing "formidable barrier" faced by federal habeas petitioner where claims already were

adjudicated in state court, and limiting relief to cases of "extreme malfunctions" by state criminal

justice systems).

A state court ruling is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002).

For a habeas petitioner to prevail under this exacting standard, the state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court.  Williams, 529 U.S. at 404-05; see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  The Supreme Court has "repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law'" for purposes of § 2254(d)(1).  Glebe v. Frost, 574 U.S. 21, 24 (2014); accord Parker v. Matthews, 567 U.S. 37, 48-49 (2012); see also, e.g., Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (warning against using circuit precedent to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced").

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule, but "unreasonably applies it to the facts of the particular state prisoner's case."  Williams, 529 U.S. at 407-08.  When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409. An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the

rule to a new context where it should apply.  Id. at 407.  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement to relief.  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc).  If a state court's decision "was reasonable, it cannot be disturbed" on habeas review.  Hardy v. Cross, 565 U.S. 65, 72 (2011) (per curiam); see Renico v. Lett, 559 U.S. 766, 779 (2010) (admonishing federal habeas courts not to "second-guess the reasonable decisions of state courts").  Relief is available only where a state court's "determination was unreasonable – a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Sanna v. Dipaolo, 265 F.3d 1, 13 (1st Cir. 2001) (explaining habeas relief is appropriate only if a state court ruling is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible options" (quotation marks omitted)).

In assessing whether a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented" to that court, § 2254(d)(2), "the fundamental principle of deference to [a state court's] findings [of fact] still applies," Hensley v. Roden, 755 F.3d 724, 731 (1st Cir. 2014).  A federal habeas court "may not characterize [challenged] state-court factual determinations as unreasonable merely because [it] would have reached a different conclusion in the first instance."  Brumfield v. Cain, 576 U.S. 305, 135 S. Ct. 2269, 2277 (2015) (quotation marks omitted).  Rather, federal courts ordinarily must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S.

322, 340-41 (2003); see Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007) (acknowledging the "separate and exacting standard applicable to review of a state court's factual findings").

III.   DISCUSSION

In this Court, Woollam asserts a violation of his "rights against compelled self-incrimination under the 5th and 14th Amendments" arising from the admission at trial "of materially inculpatory statements made by [Woollam] during police station interrogation by law enforcement, subsequent to the failure of law enforcement to honor [his] invocation of his Miranda rights to remain silent and to have counsel present for the interrogation."  Doc. No. 30 at 3.  According to Woollam, the SJC's rejection of this claim was based on unreasonable determinations of certain facts, and also was contrary to and an unreasonable application of Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny.

The Superior Court judge who denied Woollam's pretrial motion to suppress his statements to police concluded that Woollam's conversation with police had not been a "custodial interrogation."[3]  S.A. at 2319-23.  On appeal, the SJC summarized the facts pertinent to this issue "as the motion judge found them":

> Two days after Oliveira's death, after consultation with his attorney, [Woollam] voluntarily went to the Swansea police station to be interviewed by a Swansea police detective and police officer and a State police trooper.  At the beginning of the interview, the detective, who conducted the questioning, informed [Woollam]

---

[3] The motion judge first recounted the interview in some detail, describing each instance in which Woollam declined to answer a question without counsel present, referenced his Fifth Amendment rights, or asked for counsel.  S.A. at 2312-16.  The judge summarized the law applicable when an individual selectively invokes his right to counsel and described an interrogating officer's duty to "scrupulously honor" any invocation of the right to counsel under the Sixth Amendment.  Id. at 2316-18.  In the motion judge's view, the detective questioning Woollam had complied with that obligation except in one instance, where his response included a "subtle prompt for Woollam to discuss text messages" he had declined to describe earlier.  Id. at 2318.  It was that response which led the motion judge to consider the overall voluntariness of the interaction under state law, despite having concluded Woollam had not been in custody.  Id. at 2321-22.

of his Miranda rights, which he indicated that he understood. [Woollam] told the investigators that he would talk about "[s]ome things . . . but not everything." In response, the detective told him that he could refuse to answer any question. During the interview, which lasted for approximately forty-five minutes, the detective spoke in a calm and even manner. [Woollam] exhibited neither distress nor excitement. At one point [Woollam] told the detective that he trusted the detective "100 percent." [Woollam] answered some open-ended questions, and indicated that he wanted his lawyer present for others. At a couple of points during the interview, [Woollam] invoked the Fifth Amendment, but continued to speak voluntarily with the investigators. The questioning stopped when [Woollam] stated, "Before we go any further, I would like my lawyer present." [Woollam] was not arrested and was free to leave at the end of the interview.

Woollam, 87 N.E.3d at 75.

The SJC went on to describe the standard for determining whether a person is "in custody" for Miranda purposes, citing a four-factor framework applicable under Massachusetts caselaw. Id. at 75-76. Like the motion judge, the SJC concluded that three of the four factors supported finding Woollam had not been in custody:

Throughout the interview, which was investigatory rather than accusatory, the officers did not suggest to [Woollam] that he was a suspect. The officers did not tell him that the police had any incriminating evidence against him, or even that he was under suspicion. The interview was informal: [Woollam] arrived voluntarily, and during the course of the relatively short interview, both he and the detective spoke in calm, even tones. Further, [Woollam] controlled the parameters of the interview, indicating which questions he would answer and which he would not. Finally, the questioning ended when [Woollam] stated, "Before we go any further, I would like my lawyer present." He then freely left the interview, as opposed to being arrested.

Although the interview took place at the police station, a location that could be considered coercive, given the above, this factor is not dispositive.

Id. at 76 (citations omitted). The SJC also agreed with the motion judge that, "[a]t any rate, in . . . the totality of the circumstances," Woollam's statements were voluntary." Id.

A.       Determinations of Fact

Woollam devotes the bulk of his argument to challenging certain factual determinations included in the SJC's decision.  Doc. No. 30 at 23-31.  In particular, he cites four "unreasonable determinations of the facts."  Id. at 23.[4]  The Court will address each in turn.

First, Woollam urges that it was unreasonable for the motion court and the SJC to find that he "controlled the parameters" of his conversation with police.  Woollam, 87 N.E.3d at 75; S.A. at 2320.  His argument is based largely, if not entirely, on his view that the detective with whom he spoke did not terminate the interview when Woollam refused to answer certain questions without his lawyer present or referenced the Fifth Amendment.  Though the transcript of the interview does reflect that the detective continued his conversation with Woollam at several points despite such declinations, that fact alone does not render the SJC's finding unreasonable.  Indeed, there is much in the transcript to support the SJC's description.  From the start, Woollam made clear that he was agreeing to answer only certain questions.  S.A. at 2383. The detective agreed to Woollam's terms.  Id. at 2384.  Throughout the short interview,[5] Woollam identified subjects about which he did not wish to speak without counsel present, and he declined to speak on those subjects.  E.g., id. at 2388, 2390-92, 2394, 2396 (reflecting

_____

[4] In his reply brief, Woollam alludes to dissatisfaction with a fifth factual determination.  See Doc. No. 38 at 6 n.6 ("Contrary to the [SJC's] findings . . . , the question as to why Mr. Woollam did not call 911 was clearly accusatory [and not investigatory].")  As his counsel is surely aware, "[a] reply brief is not an opportunity to raise new arguments."  Graham v. Sabol, 734 F. Supp. 2d 194, 199 n.4 (D. Mass. 2010).  In any event, the record in this matter, including the entirety of the interview at issue, amply supports the reasonableness of the SJC's general characterization of the interview as "investigatory" in nature.  The single question referenced in the margin of Woollam's reply brief does not mandate a different view.

[5] The motion judge and the SJC described the interview as having lasted forty-five minutes. Woollam, 87 N.E.3d at 75; S.A. at 2313.  The transcript, however, reflects that it began at 6:57 p.m. and ended at 7:18 p.m., twenty-one minutes later.  S.A. at 2383, 2399.  The state courts' description, if erroneous, only favors Woollam, and the discrepancy is immaterial to this Court's resolution of the habeas petition.

multiple instances in which Woollam responded to a question by saying he wanted his lawyer "for that").  Much of the interview involved Woollam giving narrative answers to non-leading questions.  When he no longer wished to speak without his lawyer there, he said so, and the detective acquiesced.  Id. at 2399.

In the circumstances presented, it was far from unreasonable for the SJC to find that Woollam had exerted control over the contours of his interaction with police.

Second, Woollam faults the SJC for its description of the manner in which the interview ended.  A review of the transcript of the interview alongside the SJC's decision, however, demonstrates that it is Woollam's description of the SJC's finding that is unreasonable, not the finding itself.  According to Woollam, the SJC found "that the questioning ended when [he] asserted his right to have his lawyer present."  Doc. No. 30 at 23; Doc. No. 38 at 3.  In so paraphrasing the SJC's decision, Woollam obscures the fact that the SJC—not once, but twice—described the conclusion of the interview by directly quoting the statement Woollam made to end it.  Compare Woollam, 87 N.E.3d at 75 ("The questioning stopped when [Woollam] stated, 'Before we go any further, I would like my lawyer present.'"), and id. at 76 ("Finally, the questioning ended when [Woollam] stated, 'Before we go any further, I would like my lawyer present.'"),[6] with S.A. at 2399 (reflecting that questioning ended after Woollam said, "Before we go any further, I would like my lawyer present.").  Woollam does not suggest that there is more to the interview than what appears in the transcript.[7]

---

[6] The SJC's decision contains a typographical error in this sentence, attributing the quote of Woollam to "the detective," rather than "the defendant."  The earlier reference to the same quote correctly attributed it to "the defendant."

[7] The interview ended as follows:

Q.    You've had the whole day now to think about it.
A.    Yes.
Q.    What do you think happened?

There is simply nothing unreasonable about the SJC's verbatim description of the statement by Woollam that precipitated the termination of his interaction with the police.

Third, Woollam argues that the SJC was wrong in finding that he "invoked his Fifth Amendment rights against compelled self-incrimination" at only "a couple of points" during his conversation with police. Doc. No. 30 at 23. Again, however, Woollam's characterization the SJC's decision disregards adjacent statements making clear that the SJC was merely describing the contents of the interview transcript. Immediately before the "couple of points" sentence to which Woollam objects, the SJC observed that Woollam had "answered some open-ended questions, and indicated that he wanted his lawyer present for others." Woollam, 87 N.E.3d at 75 (emphasis added). Thus, the SJC's decision is not fairly read as having found that Woollam asserted his Miranda rights in some form only twice during the entire interview. As the SJC described, the transcript reflects several instances in which Woollam declined to answer specific

---

A.   I mean, as much as I've tried, and trust me I have, this is my best friend, and I really don't know (inaudible)

Q.   Well, he didn't get ripped, because there were still drugs in there, right?

A.   I understand.

Q.   Right? If he was getting ripped, they probabl[y] would've taken all the drugs, right?

A.   More th[a]n likely, yes.

Q.   So, I really don't think it was a rip.

A.   Right. Before we go any further, I would like my lawyer present. Just so that we could talk about everything. I'd like my lawyer present –

Q.   You want to call him?

A.   Yeah. I mean I can get in touch with him. (inaudible) to get him down here, if you could. Sure.

Q.   You can call him. Why don't we just shut the tape off.

A.   Do that.

Q.   It's 7:18.

(whereupon recording concluded)

S.A. at 2398-99; see id. at 1480, 1486-1501, 1548, 1613-22, 1630-32, 1687-89 (reflecting detective's trial testimony describing the interview and referencing no information beyond that which appears in the transcript).

questions or address specific topics without his lawyer present.  E.g., S.A. at 2388, 2390-92, 2394, 2396 (declining to talk about certain events on July 4th, whether Woollam had removed any items from the victim's home, "anything about drugs," the reason for tension between himself and the victim, whether Hodgate slept at the victim's apartment, and his cell phone number).  And, as the SJC described, the transcript reflects precisely two instances in which Woollam expressly referenced the Fifth Amendment.  See id. at 2390 ("I plead the 5th."); id. at 2394 ("I'm pleading the 5th.").

Thus, the transcript demonstrates that the SJC's summary of this aspect of the interview was not only reasonable, but accurate.[8]

Finally, Woollam disputes the SJC's finding that he continued to speak with police voluntarily after asserting his right against self-incrimination on various occasions.  Doc. No. 30 at 23.  Woollam does not dispute that he went to the police station voluntarily, after consultation with counsel.  Nor does he challenge the state courts' factual determinations that both he and the detective spoke calmly for the duration of the interview, without aggressive accusations or a combative tone on the part of the detective, and without "distress" or "excitement" on the part of Woollam.  Woollam, 87 N.E.3d at 75.  What Woollam glosses over in his own summary of the interview is that on several occasions, he literally did "continue[] to speak voluntarily with the investigators" after having refused to answer a question without his lawyer present.  Id.  That is,

---

[8] In each of his submissions, Woollam dissects the transcript and counts at least ten instances in which he says he invoked his Miranda rights, obligating his interviewers to cease questioning.  Doc. No. 1 at 9-12 (underlining eleven such responses); Doc. No. 30 at 24-29 & n.14 (underlining and adding bracketed numbers before ten such responses); Doc. No. 38 at 4-8 (same).  Though some of the responses Woollam identifies are grouped together, such that they are not in fact distinct from one another, the Court need not quibble over the number of discrete times Woollam gave answers invoking his rights against self-incrimination.  Whether he did it five times or eleven, the SJC's reasonable conclusion that he spoke voluntarily and was not in custody means that he cannot secure habeas relief, as his Miranda rights had not attached.

the transcript shows at least three times where Woollam expressly declined to talk about a particular subject without his lawyer <u>and then immediately, without any intervening question by the detective, continued speaking</u>.  <u>See</u> S.A. at 2388 ("I'd like my lawyer present for all that. Not to say anything like, you know – but Fourth of July I went to a few parties with my chic [sic] . . . ."); <u>id.</u> at 2390 (having declined to say whether he removed anything from the scene of the killing, and then clarified in an exchange with the detective that he would not address that subject without his lawyer present, to which the detective ultimately said "Fair enough," Woollam sua sponte denied hiding anything or having killed the victim); <u>id.</u> at 2392 ("I'd like my lawyer for that.  That's a different – a whole different thing.  Not that I was screwing around with her.  I'm pretty sure he knew that I would never do that. . . .").[9]

On this record, absent a showing by Woollam that he was distressed or otherwise felt pressured by the detective to speak when he did not wish to do so, it was not unreasonable for the SJC to find that Woollam continued to speak voluntarily—just as it reasonably found he had controlled the parameters of the conversation.

All told, Woollam has failed to establish—by clear and convincing evidence or by any other standard of proof—that the SJC's factual determinations were unreasonable and, therefore, unworthy of this Court's deference.[10]

---

[9] The transcript also reveals other instances in which Woollam declined to answer a certain question in his lawyer's absence, but then continued speaking without expressing any further reservations when the detective transitioned to a different topic. <u>E.g.</u>, S.A. at 2391 (asking about the victim's request that Woollam clean his car after Woollam declined to answer questions about "drugs or anything"); <u>id.</u> at 2394 (returning to a topic previously discussed after Woollam declined to answer questions about where Hodgate slept); <u>id.</u> at 2396 (returning to a topic previously discussed after Woollam declined to provide his cell phone number).

[10] Woollam has not challenged any other aspects of the SJC's recitation of the facts, nor has this Court's review identified any other clear errors or unreasonable factual determinations.

B.      Clearly Established Federal Law

Besides challenging the SJC's factual determinations, Woollam also urges that the SJC "fail[ed] to apply the definition of custodial interrogation that is contained in Miranda v. Arizona and its progeny."  Doc. No. 30 at 33-34.  This argument fails.

As an initial matter, there is no colorable basis to suggest that the SJC's reasoned decision was "contrary to" federal law.  As Woollam recognizes, a suspect's Fifth Amendment rights against self-incrimination arise only in the context of a custodial interrogation.  Supreme Court precedent broadly defines the standard for determining whether a person is "in custody" for Miranda purposes as an objective assessment of the circumstances surrounding the person's interaction with police.  Howes v. Fields, 565 U.S. 499, 508-09 (2012).  To ascertain whether a particular set of circumstances would have caused a "reasonable person" to feel he "was not at liberty to terminate the interrogation and leave," Thompson v. Keohane, 516 U.S. 99, 112 (1995), the Supreme Court has identified various "[r]elevant factors," including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning," Fields, 565 U.S. at 509 (citations omitted).  Though the SJC described these standards by reference to its own prior decisions, its recitation of the relevant legal principles was altogether consistent with this clearly established federal law.  See Woollam, 87 N.E.3d at 75-76 (defining "custody" and the objective standard for assessing it, then listing and discussing factors including location and nature of the exchange).

Next, the rule established in Miranda is a general one, as are the Supreme Court's

decisions outlining the standard by which "custody" is assessed.[11]  Alvarado, 541 U.S. at 664.

As such, the SJC is afforded substantial leeway as it applies those rules to the circumstances

presented in any given case.  Id.  As the respondent capably explains in his brief, an examination

of the Supreme Court's jurisprudence in this area shows that the SJC's decision was consistent

with, and an objectively reasonable application of, clearly established federal law analyzing what

circumstances amount to "custody."  See Doc. No. 33 at 19-23 (discussing in detail the facts

considered in Oregon v. Mathiason, 429 U.S. 492 (1977), California v. Beheler, 463 U.S. 1121

(1983), Alvarado, and Fields, and comparing them to the facts presented here).

Finally, this Court's independent review of the record confirms the reasonableness of the

SJC's assessment that Woollam made voluntary statements during a noncustodial interview.  He

consulted a lawyer before appearing for the interview.  At the outset, he made clear that he only

wished to speak about certain topics.  Throughout the interview, he repeatedly and firmly

expressed his desire not to speak about some subjects without his lawyer present, then either

responded when questioning shifted to another topic or affirmatively redirected the conversation

---

[11] Woollam relies on many cases which involve Miranda generally, but which did not present "custody" questions akin to the one presented here.  See, e.g., Missouri v. Seibert, 542 U.S. 600 (2004) (involving pre-warning and post-warning statements by a suspect who was plainly in custody at the time of both statements); Rhode Island v. Innis, 446 U.S. 291 (1980) (addressing the meaning of "interrogation," not custody).  Such cases do not set any clearly established principles of federal law applicable—let alone unreasonably applied by the SJC—here.  He also relies on a decision of Indiana's intermediate appellate court, which for obvious reasons neither binds the SJC nor constitutes clearly established federal law.  See Bean v. Indiana, 973 N.E.2d 35 (Ind. Ct. App. 2012) (finding suspect in custody where police drove him to the station after having searched his home for child pornography; the questioning began with a focus on his guilt of one crime (possession of child pornography) and then escalated to whether he was guilty of a second, more serious crime (child molestation); the questioning was accusatory, "clearly aggressive," and "fairly lengthy" (lasting more than two hours); the suspect was not allowed to leave the station at the end of the questioning; and the suspect's mid-questioning requests to leave and to speak with a lawyer were met with continued aggressive questioning).

on his own.  Nothing before the Court suggests that the detective's questioning or demeanor operated to overwhelm Woollam's will or undermine the voluntariness of his participation in the interview.  The detective accused him of no crime during the interview, and he confessed to none.  The short interview ended promptly when Woollam unqualifiedly asked to speak with his his lawyer before going any further.[12]  In these circumstances, this Court will not second-guess the state courts' sensible conclusion that Woollam's Fifth Amendment rights had not attached, let alone been violated, during the July 6th interview.[13]

In sum, the SJC's ruling was neither contrary to, nor unreasonable applications of, Miranda or any other clearly established federal law.

IV.    CONCLUSION

Because his federal claim is meritless, Woollam's petition (Doc. No. 1) is DENIED.[14]

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge

---

[12] Though Woollam had referenced his lawyer on other occasions, most of them had included language specifying, or at least reasonably suggesting, that the reference was limited to the topic of the question just asked.  Given his specification at the outset that he would talk about only "some things," S.A. at 2383, those references are reasonably viewed as efforts to control the contours of the discussion, rather than to cut it off entirely.

[13] Though the parties do not discuss it, the Court notes that Woollam testified at his trial.  His testimony on direct examination alone addressed his personal and working relationship with Oliveira; his involvement in drug dealing; his use of pills and his provision of them to Oliveira's girlfriend; the manner in which Oliveira learned Woollam was providing pills to his girlfriend and how Oliveira responded; and his activities, interactions, and movements on July 4th, 5th, and 6th, 2006.  S.A. at 1712-58.  Even if there were a basis upon which to conclude that the admission of Woollam's statement to police in the prosecution's case-in-chief was erroneous (and there is not), Woollam's decision to testify may have opened the door to the use of that statement to impeach his testimony.  Harris v. New York, 401 U.S. 222, 224-26 (1971).

[14] As "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," Slack v. McDaniel, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue.  As explained fully above, the state courts' determination that Woollam was not in custody at the time of his interview with police arose from reasonable determinations of the facts and reasonable application of the correct legal standards.